UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>DAVID SECHOVICZ<br><br>    Defendant. | Case No. |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC") alleges:

### SUMMARY OF THE ACTION

1. This complaint concerns an affiliate marketer who along with his business partner fraudulently offered and sold securities called "binary options" by disseminating false and misleading videos, websites, and advertising through the Internet to millions of prospective investors in the United States and globally.

2. From at least January 2014 through December 2016 (the "Relevant Period"), David Sechovicz ("Defendant") together with his business partner, Peter Szatmari ("Partner"),[1] created and disseminated numerous false and misleading Internet-based marketing campaigns designed to induce investors to open and fund binary options trading accounts with overseas brokers. These brokers, in turn, paid Defendant and Partner each time a new investor referred by them made an initial deposit for trading binary options. These brokers were not registered with

---

[1] The Commission has filed separately an action today against Mr. Szatmari.

the SEC, and they offered and sold unregistered binary options referencing securities and securities indices to investors opening and funding those accounts.

3. Defendant with Partner worked as an "affiliate marketer." Affiliate marketing is a form of performance-based marketing where an advertiser promotes a third party's goods or services, often over the Internet. The affiliate marketer receives a payment each time a person referred to the third-party takes a specified action, like clicking a link or making a purchase. Here, Defendant and Partner promoted the opening of binary options trading accounts with overseas unregistered brokers that offered and sold unregistered binary options referring to securities. In doing so, Defendant was a necessary factor and substantial participant in the offer of unregistered securities-based binary options by those brokers.

4. Defendant with Partner solicited investors by sending, or paying others to send, millions of emails to prospective customers. The emails contained links to the binary options marketing campaigns, which included written communications and videos that touted free software trading programs supposedly capable of generating large profits for investors who opened binary options trading accounts with specific "recommended" brokers.

5. Defendant with Partner also paid various third-party websites to host numerous advertorials – advertisements stylized as news articles – that contained false and misleading statements designed to funnel prospective investors to Defendant and Partners' binary options marketing materials, typically websites containing the false and misleading videos.

6. These videos purported to show actual investors and real results, including people enjoying rich lifestyles supposedly achieved through binary options trading. The videos also contained purported "live" demonstrations of people opening and funding accounts in "real time"

and seeing their trading balances increase automatically. The participants in the videos insisted to viewers that their stories were true.

7. Yet what was depicted was entirely fiction. Paid actors pretended to be the creators of software that could effortlessly generate millions of dollars trading binary options; fake testimonials claimed falsely that there was great wealth made by investing in, and using the free trading software to purchase, binary options; and fabricated photos showed only fictional account statements. The "live" demonstrations of profitable trading were shams.

8. In addition, the videos claimed that the software only worked with a specific and "recommended broker." In reality, there was never any software capable of producing the promised results. Additionally, the "recommended" brokers were simply those who agreed to pay Defendant and/or Partner each time an investor opened and funded a binary options trading account.

9. Defendant with Partner received a flat commission – customarily between approximately $350 and $450 – for every customer who viewed their materials and then opened and funded a binary options trading account with a recommended broker.

10. By virtue of this conduct and other conduct described in this Complaint, Defendant violated the antifraud provisions of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5.

11. Defendant was also a necessary factor and substantial participant in an illegal offering or sale of unregistered securities and also violated the registration provisions of Section 5 of the Securities Act, 15 U.S.C. § 77e.

12. The Commission seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, disgorgement of ill-gotten gains, injunctions, and such other relief as the Court may deem necessary and appropriate. Unless restrained and enjoined by this Court, Defendant is likely to continue to engage in the acts and practices alleged herein.

## JURISDICTION AND VENUE

13. The Commission brings this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a). Defendant, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce or of the mails in connection with the activities alleged in this Complaint, including by making use of the Internet to offer securities and sending or receiving interstate email and participating in interstate voice or video calls.

14. Venue is proper in this district pursuant to Section 22(a) of the Securities Act and Section 27(a) of the Exchange Act because, during the Relevant Period, Defendant lived in this district and carried on his affiliate marketing from this district; thus, acts and transactions in violation of the federal securities laws as alleged in this Complaint occurred within this district.

## DEFENDANT

15. **David Sechovicz**, age 37, resided in Massachusetts during the Relevant Period of the unlawful activities alleged in this Complaint and today resides in Puerto Rico.

## FACTS

I. **AFFILIATE MARKETING IN BINARY OPTIONS SECURITIES**

16. Binary options are financial instruments with a value tied to the price of a reference asset, including securities and securities indices. An investor chooses whether the underlying asset's price will be above or below a certain price at a particular time (*e.g.,* will

4

Apple, Inc. stock be above $100 per share at 1 p.m. on a particular day). The options are considered "binary" because they carry only two possibilities: the investor whose prediction is correct makes money; the investor whose prediction is incorrect loses the investment. Unlike other types of options, a binary option does not give the holder the right to purchase or sell the underlying asset. Instead, it is "cash settled."

17. Binary options referencing a security or securities within the meaning of Section 2(a)(1) of the Exchange Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), are themselves "securities" within the meaning of those provisions.

18. Affiliate marketers typically promote over the Internet a product or service owned or provided by a third party (*e.g.,* a vendor) and are paid by the vendor when they cause someone to take a specific action, like clicking a link or buying the vendor's product or service. Here, binary options brokers paid Defendant and/or Partner a pre-set commission (typically $350 to $450) for each investor who opened and funded an account with those brokers after viewing fraudulent marketing materials that Defendant with Partner created and disseminated.

## II. DEFENDANT AND PARTNERS' FRAUDULENT OFFERS OR SALES OF BINARY OPTIONS

19. Between 2014 and 2016, Defendant with Partner created and distributed at least six false and misleading marketing campaigns designed to persuade potential investors predominately in the United States to open and fund binary options trading accounts with overseas unregistered brokers operating on the Internet. The marketing campaigns' advertising materials generally consisted of (a) textual materials disseminated over the Internet; (b) a website; and (c) one or more videos embedded into the website.

20. The six binary options affiliate marketing campaigns that were created and disseminated during this period consisted of campaigns going by the following names:

| Campaign Name | Year |
|---|---|
| Wall Street Millionaire | 2014 |
| Automated Money Kit | 2014 |
| Click Click Money | 2014 |
| The Cash Code / Robert Allen System | 2015 |
| Guaranteed Wealth | 2015 |
| The Conservative Investor | 2016 |

21. Defendant with Partner disseminated the materials associated with these campaigns using bulk/spam emails and paying media companies to distribute advertisements to their subscribers by email or as "sponsored content", a practice known as media buying. The materials disseminated by email and the media buys typically contained false and misleading statements touting a free and easy way to make money using a secret software system. These written materials were designed to entice potential investors into clicking a link that would take them to the campaign websites falsely describing the secret software system and its potential to make users rich.

22. For example, an electronic mail message disseminated in connection with Defendant and Partner's Wall Street Millionaire binary options campaign read: "I've been cashing in an additional $9500 weekly income ever since I started using this amazing FREE software. Download your FREE copy here before they start selling it." Embedded in the email – typically where it read "here" – was a hyperlink that directed readers to the campaign website.

23. Similarly, an email sent in connection with the campaign called Cash Code contained the following language: "Imagine the size of your bank balance going from $0 to $135,000 in the next few months. Now imagine you did it with totally automated software.

Software you can set up in 7 minutes or less . . . I've never seen anything like this. >>Read the shocking details and proof here<<".

24. Investors who clicked the hyperlink in the written materials were taken to the campaign websites that featured the false and misleading videos. Generally, the videos included the following types of misstatements: (1) false guarantees that the trading software would automatically generate significant profits for customers after they opened and funded accounts with a broker; (2) actors pretending to be real users, creators, or owners of the trading software; (3) fictitious depictions of customer bank and trading statements reflecting large balances or profits; (4) fictitious testimonials where actors claimed to have profited using the fake software; (5) fake "live" software demonstrations; and (6) false representations that the brokers to which the materials referred investors were actually "recommended" for reasons other than their payment to Defendant and Partner.

25. For example, the videos contained the following falsities:

 a. The <u>Wall Street Millionaire</u> videos told a contrived story about a person named Stanley who developed a purported system for trading binary options that supposedly enabled him to generate $1.54 million in a year, or an average of $4,500 each day. In reality, "Stanley" was a paid actor who never developed any software nor profited trading binary options.

 b. <u>Click Click Money</u> featured videos that included a fictional spokesperson, Seth Warburton, who displayed fake bank account statements reflecting nearly $800,000 he supposedly earned in just months using the software. The actor portraying Warburton falsely claimed the software "can generate between $523

7

and $4,098 of pure profit per day. . . for even the hopeless newbie," and can pick winning trades at least 92 percent of the time.

 c. The Cash Code included a video that falsely stated that the corresponding software "has made more millionaires in the past 6 months than any other website on earth." Further, the video: (1) showed several fake bank account balances in the millions that supposedly resulted from use of Cash Code; (2) showed the supposed real-time growth of an account from $250 to hundreds of thousands of dollars in just minutes; (3) claimed the system has "100% accuracy;" and (4) stated that "All of our clients are financially independent within 60 days of using this system . . .on average – by that they require no job or any other source of income to sustain themselves from that point on."

 d. The Guaranteed Wealth videos featured "Victor Lambert," who supposedly discovered a system that picked winning binary options trades with over 90 percent accuracy. Lambert claimed he made "over $2.8 million in profits" over the past two years. The video displayed fake account statements to show purported winning trades and purported real-time updates showing an account balance increasing from $250 to more than $23,000 in a matter of days. The video includes a series of false testimonials in which purported users of the software told of their five-digit returns.

26. The videos also falsely stated that the brokers linked on the campaign websites were chosen because they were trustworthy or their systems contained a glitch that could be exploited by the software to make money. In reality, the brokers were chosen only because they

had agreed to pay to Defendant and/or Partner a referral fee for each investor signing up and making a deposit.

27. Defendant knew or was reckless in not knowing that their marketing materials were materially false and misleading.

28. Partner's work on these campaigns generally included identifying, soliciting, and/or negotiating with binary options brokers regarding commissions and other matters; creating solicitation materials; obtaining, rebranding, and distributing automated trading software; performing accounting functions; and arranging for the bulk dissemination of solicitations, including through social media. Defendant's work generally included monitoring the customer service email addresses associated with the campaigns and responding to investor emails; developing content and design for internet websites that supported the campaigns; registering campaign websites; and arranging for the bulk dissemination of solicitations

29. Defendant with Partner caused false and misleading materials related to these campaigns to be sent to millions of potential investors. These materials were viewed by more than 350,000 persons and they caused more than 25,000 investors to make deposits for trading binary options with one of approximately 35 unregistered brokers.

30. The unregistered brokers offered and sold binary options referencing securities over the Internet to investors in the United States. For example the table below reflects the securities and securities indices offered and sold by three brokers, representing approximately two-thirds of the referrals that Defendant and Partner made over the relevant period.

| Broker | Number Investors Referred | Securities Offered | Securities Indices Offered |
|---|---|---|---|
| **Broker 1** | 5377 | 19 (e.g., Microsoft, Apple, Coca Cola, Nike). | 20 (e.g., DJIA, NASDAQ, S&P, FTSE, Hang Seng) |
| **Broker 2** | 8822 | 20 (e.g., Apple, Facebook, IBM, Exxon). | 8 (e.g., DJIA, NASDAQ, S&P) |
| **Broker 3** | 3532 | 28 (e.g., Apple, Nike, Tesla, Netflix). | 5 (e.g., DJIA, NASDAQ, S&P) |

31. Defendant himself personally realized approximately $1.9 million in profits from operating these six campaigns with Partner between 2014 and 2016.

32. Defendant with Partner also engaged in what they referred to as "remarketing" by distributing other affiliate marketers' false and misleading binary options marketing campaigns, including using their own email mailing lists, for compensation. Defendant knew or recklessly failed to know that the campaigns they "remarketed" included false and misleading statements about profits and risk of loss.

**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**FIRST CLAIM FOR RELIEF**

**Fraud in the Offer or Sale of Securities**
**Violations of Section 17(a) of the Securities Act**

33. Paragraphs 1-32 are realleged and incorporated by reference herein.

34. Defendant, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    (a) with scienter, employed devices, schemes, or artifices to defraud;

(b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

35. By reason of the foregoing, Defendant violated, and unless enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SECOND CLAIM FOR RELIEF

### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

36. Paragraphs 1-35 are realleged and incorporated by reference herein.

37. Defendant, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities or interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon other persons.

38. By reason of the foregoing, Defendant violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

### Unregistered Offer or Sale of Securities
### Violations of Section 5 of the Securities Act

39. Paragraphs 1-38 are realleged and incorporated by reference herein.

40. No registration statement had been filed or was in effect for any of the security-based binary options offered or sold through Defendant and Partners' marketing campaigns.

41. Defendant, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or to sell such securities.

42. By reason of the foregoing, Defendant violated, and unless enjoined will again violate, Section 5 of the Securities Act, 15 U.S.C. §§ 77e.

### RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

a) Find that Defendant committed the alleged violations;

b) Order Defendant to disgorge, with prejudgment interest, all ill-gotten gains received or derived from the activities set forth in this Complaint, and to repatriate any ill-gotten funds or assets caused to be sent overseas;

c) Order Defendant to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

d) Order that Defendant is prohibited from, directly or indirectly, including through any entity he owns or control, participating in the marketing, offer or sale of securities over the Internet or by email or other forms of electronic communication;

e) Permanently enjoin Defendant from directly or indirectly violating Sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e & 77q(a), and Sections 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

f) Retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

g) Grant such other and further relief as may be necessary or appropriate.

Dated: September 26, 2019

Respectfully submitted,

/s/ Kenneth W. Donnelly
Kenneth W. Donnelly (DC # 462996)
Trial Counsel for Plaintiff
**Securities and Exchange Commission**
100 F Street, N.E.
Washington, DC 20549-5949
Tel. (202) 551-4946
Fax (202) 772-9282
Email: donnellyk@sec.gov

Of Counsel:
Jennifer A. Leete
Jason M. Anthony
Michael S. Fuchs